UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

GARY J. EDEL

               Plaintiff,

     v.                               **REPORT AND RECOMMENDATION**
                                        **06-CV-440 (LEK)**

COMMISSIONER OF SOCIAL SECURITY,

               Defendant,

### Jurisdiction

1.  This case was referred to the undersigned for report and recommendation by the honorable Norman A. Mordue on October 20, 2008, pursuant 28 U.S.C. § 636(b)(1)(B), and is presently before the Court on a motion for judgment on the pleadings as supported by Defendant's Brief of May 25, 2007. This Court has jurisdiction under 42 U.S.C. § 405(g).

### Background

2.  Plaintiff, Gary J. Edel, challenges the Administrative Law Judge's ("ALJ") determination that he is not entitled to disability insurance benefits ("DIB") under the Social Security Act ("the Act"). Plaintiff alleges he has been disabled since January 1, 1993, because of human immunodeficiency virus ("HIV"), Hepatitis C virus ("HCV" or "Hepatitis C") and depression (R. at 126).[1] The Plaintiff met the non-disability insured status requirements of the Act through September 30, 1999.

### Procedural History

3.  Plaintiff filed an application for both DIB and Supplemental Security Income ("SSI") with a protective filing date of October 30, 2002 (R. at 140). His application was denied initially on March 11, 2003 and, under the prototype model of handling claims without requiring a reconsideration step, Plaintiff was permitted to appeal directly to the ALJ (R. at 35-39). See 65

---

[1] Citations to the underlying administrative are designated as "R."

Fed. Reg. 81553 (Dec. 26, 2000). Plaintiff filed a timely request for a hearing, and on May 21, 2004, Plaintiff and his attorney appeared before ALJ Joseph F. Gibbons (R. at 40, 457-84).  The ALJ considered the case *de novo*, and on July 20, 2004, found Plaintiff was disabled as of October 30, 2002 and therefore entitled to SSI, but not DIB (R. at 52-62).

4.   Plaintiff requested review by the Appeals Council and on September 17, 2004, the Appeals Council remanded the case for further proceedings to "[c]ompletely evaluate the issue of the claimant's disability from January 1, 1993, the claimant's alleged onset date, through September 30, 1999, the claimant's date last insured" (R. at 66). Plaintiff and his attorney again appeared before ALJ Gibbons for a hearing on March 2, 2005 (R. at 431-55). On March 9, 2005, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act between January 1, 1993 and September 30, 1999 (R. at 20-32). The ALJ's March 9, 2005 decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's second request for review on November 28, 2005 (R. at 6-8).

5.   On April 10, 2006 Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Section 405(g) of the Act, reverse the decision of Defendant, and grant DIB to Plaintiff. Defendant filed an Answer to Plaintiff's Complaint on November 20, 2007, requesting that the Court dismiss Plaintiff's Complaint. Plaintiff appears before this Court *pro se* and has not filed a brief in this action. On May 25, 2007, Defendant filed a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[2]  The Court deemed oral argument unnecessary and took the motion under advisement.

---

[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

6.  It is noted that Plaintiff failed to file a Plaintiff's Brief. For the reasons set forth below, it is recommended that Defendant's motion for judgment on the pleadings be denied.

**Facts**

7.  Plaintiff alleges he has been disabled since January 1, 1993 because of HIV infection, Hepatitis C and depression (R. at 126).

### A.  Pre-1999 Treating Source Evidence

The relevant time period for Plaintiff's claim is January 1, 1993 through September 30, 1999. During that period Plaintiff was treated at the Inwood Lawrence Health Center (R. at 210), but the evidence indicates that those medical records were routinely shredded or otherwise destroyed (R. at 177). Therefore, the remaining contemporaneous evidence from this relevant period consists of records from Nassau County's Plainview Rehabilitation Center in 1993, and several Doctor's visits and laboratory reports from Nassau County Medical Center in 1999.

### 1.  Plainview Rehabilitation Unit

On October 12, 1993, the Plainview Rehabilitation Unit conducted a psychosocial assessment of Plaintiff (R. at 208-09). Plaintiff told his counselors that he began using alcohol at age 13 and that he perceived difficulty with using alcohol by age 19 (R. at 208). Mr. Edel reported two prior substance abuse treatments in 1987. Id. The report records Plaintiff's drug history as (1) daily marijuana use beginning at age 13 and last used in 1993; (2) intravenous cocaine use from 1980 to 1982 and snorted cocaine use several times a week from 1982 to 1993; (3) angel dust two to three times a week between the ages of 13 and 25; and (4) some infrequent use of uppers, downers or acid (R. at 209). In this assessment, counselors diagnosed Plaintiff with middle stage alcohol problem. Id. After six weeks of inpatient care, Plaintiff was released from Plainview at his own request and against the advice of his treatment team (R. at 210). In Plaintiff's discharge summary, his counselor concluded, "Mr. Edel's issues of denial;

codependency; anger; grief; grandiosity, and total resistance to any form of advisement have prevented him from developing any reality based recovery planning and/or participation." Id.

### 2. Nassau County Medical Center

Records from Nassau County Medical Center consist of notes from a Doctor's visit and a blood test report from June 1999, a blood test report from October 1999, and notes from a Doctor's visit in June 2000 (R. at 180-87, repeated at 368-74).

Although the laboratory report from February 1999 is not in the record, the Doctor[3] who treated Plaintiff in June 1999 recorded blood test results from February 1999 (R. at 184). The Doctor wrote that in February 1999, Plaintiff was not on medication, had a viral load[4] of 47,240, a CD4[5] count of 323, and was negative for toxoplasmosis[6] and syphilis. Id.

On June 8, 1999, Plaintiff's blood was collected and testing revealed: a viral load of 655 (R. at 185); elevated glucose; elevated ALT and AST (liver enzymes); elevated total bilirubin; low absolute lymphocyte[7] count; evidence of Howell-Jolly bodies[8] in red blood cells; low white blood cell count (R. at 186); several elevated red blood cell indices; low CD4[9]; high CD8;[10] low ratio of CD4 to CD8 at .39;[11] and the notation "helper T cells are decreased" (R. at 187).

---

[3] In each of the treatment records from Nassau County Medical Center the Doctor's name is illegible and no specialty is noted.

[4] Viral load is a measure of the concentration of HIV RNA in the blood. The viral load is an indicator of HIV progression and whether treatment is working. As HIV is not normally present in human blood, there is no normal range for this value. AIDSinfo, U.S. Department of Health and Human Services, http://www.aidsinfo.nih.gov/Glossary/GlossaryDefaultCenterPage.aspx (search "viral load").

[5] CD4 is an infection-fighting white blood cell that coordinates the immune response. HIV infects and kills CD4 cells, weakening the immune system. CD4 count is a useful indicator of immune system health and HIV/AIDS progression. A normal CD4 count is approximately 500 to 1,400 cells/mm³ of blood, but individual counts can vary. The CD4 percentage is the percent of white blood cells that are CD4.  The CD4 percentage is less variable from blood test to blood test. Id. (search CD4).

[6] Toxoplasmosis is infection by Toxoplasma gondii. Id. at 1970.

[7] Lymphocytes are a type of white blood cell. Id at 1042, 1100.

[8] Howell-Jolly bodies may indicate spleen dysfunction or breakdown of red blood cells. See Dorland's Illustrated Medical Dictionary 237 (31st ed. 2007) [hereinafter Dorland's].

[9] Plaintiff had an absolute count of 208 and 20% CD4 (R. at 187). This laboratory gave a reference range for CD4 count as 390-1460, and a reference range for CD4 percentage as 34-61%. Id.

[10] Plaintiff had 51% CD8 with an absolute count of 530. Id. This laboratory's reference range for CD8 count is 180-700, and for CD8 percentage it is 13-36%. Id.

[11] This laboratory's reference range for CD4 to CD8 ratios is 1.10-4.20. Id.

On June 17, 1999, Plaintiff was treated at Nassau County Medical Center (R. at 184). Plaintiff weighed 78 kg, which is approximately 171 pounds. Id. Treatment notes indicate Plaintiff complained of shortness of breath and occasional rash on his forehead. Id. Nonetheless, the Doctor wrote that Plaintiff had "no complaints" and was "doing well." Id. The Doctor indicated Plaintiff was on Crixivan[12] and Combivir.[13] Id.

On October 21, 1999, Plaintiff again had his blood tested (R. at 181-83). The abnormal test results were: high AST and ALT (liver enzymes); low absolute lymphocytes (R. at 181); elevated reticulocyte[14] percentage; elevated hemoglobin; several elevated red blood indices; low red blood cell distribution width; low CD4 at 23% with an absolute count of 280; high CD8 at 45% with an absolute count of 549; low CD4 to CD8 ratio at .51 (R. at 182). The report stated that "helper T cells are decreased" (R. at 183). Plaintiff tested negative for Hepatitis B, syphilis, and toxoplasmosis, but tested positive for both Hepatitis A and C (R. at 181-83).

### B.  Post-1999 Treating Source Evidence

The record contains medical reports from Nassau County Medical Center, Albany Medical Center, the Family Counseling Center, and St. Mary's Hospital and Rehabilitation Clinic, all dated after Plaintiff's alleged onset of disability in September 1999.[15]

### 1.  Nassau County Medical Center

On June 29, 2000, Plaintiff was again treated at Nassau County Medical Center (R. at 180). Plaintiff complained of shortness of breath and night sweats and he weighed 80 kg, which

---

[12] Crixivan is a preparation of indinavir sulfate, a protease inhibitor that blocks a protein that HIV needs to form mature viral particles. See Dorland's, supra note 8, at 441, 946.

[13] Combivir is a trademark preparation of zidovudine and lamivudine, two synthetic nucleoside analogues which inhibit reverse transcriptase and inhibit the replication of retrovisruses like HIV. Id. at 397, 1017, 2119 .

[14] Reticulocytes are immature red blood cells. Id at 252, 1656.

[15] Dr. David Dixon, M.D., an orthopedic doctor, saw Plaintiff for the tumor on his left foot (R. at 330-33). Summary of this ailment is not included in the facts because Plaintiff has not alleged that it attributed to his alleged disability during the relevant period. Plaintiff was also treated at Albany Medical College for sensorineural hearing loss and "fairly severe bilateral maxillary sinus disease" (R. at 342); see (R. at 334-42). These records are similarly excluded from the facts.

is approximately 176 pounds. Id. Plaintiff was recorded as Hepatitis A and C positive, HIV positive due to "IVDA" (intravenous drug abuse), and as having had a substance abuse problem. Id. The Doctor noted that Plaintiff had been in rehabilitation for about two months and was recently released. Id. He noted that Plaintiff had been off medication for about one month, but was back on Crixivan and Combivir. Id.

### 2. Albany Medical Center

On June 19, 2001, Plaintiff began treatment at Albany Medical Center where he was seen by Physician's Assistant ("PA") Nicole Dunn and Cynthia H. Miller, M.D.[16] (R. at 203-07). At his initial visit, Plaintiff reported his medications as Crixivan, Combivir, and Juven[17] (R. at 203). His risk factor was recorded as intravenous drug use/shared needles and his substance abuse history was recorded as smoking, crack, alcohol, cocaine, occasional marijuana and having tried heroin. Id. Plaintiff complained of his nose drying out on the left side, a cut in his ear that would not heal, left-sided costovertebral[18] angle tenderness, deformities on the second and third digits of the right foot, and onychomycosis[19] (R. at 204). He reported a past medical history of Hepatitis C, pneumonia, depression, onychomycosis, gonorrhea, and chlamydia (R. at 205). The record notes that Plaintiff tested positive for HIV in 1991 "because used IV drugs" and that Plaintiff "couldn't handle diagnosis and started using again" but that he had been clean for the last five months. Id. Plaintiff reported starting Norvir[20] in 1997 and Crixivan and Combivir in 1998, with some missed doses. Id. The record notes the last viral load as 10,000 and the last CD4 count at 200. Id. Plaintiff weighed 185 pounds (R. at 206).

---

[16] No specialty is noted for Dr. Miller.

[17] Juven is a nutritional supplement, containing the amino acids glutamine and arginine, which may promote muscle growth. National Cancer Institute Drug Dictionary, U.S. National Institutes of Health, http://www.cancer.gov/Templates/drugdictionary.aspx?CdrID=269682.

[18] Costovertebral pertains to a rib and a vertebra. Dorland's, supra note 8, at 431.

[19] Onychomycosis is a fungal or sometimes bacterial infection of the nails. Id. at 1342, 1955-56.

[20] Norvir is a preparation of ritonavir, an HIV protease inhibitor. Id. at 1311, 1675.

A summary of lab results shows that in June 2001 Plaintiff had an absolute CD4 count of 338, which at 23% was considered low,[21] and a viral load of 510 (R. at 196). Results from August 2001 showed Plaintiff's viral load down to 72 and an absolute CD4 of 309, or 24%. Id. In February 2002, Plaintiff's CD4 was 21% with an absolute count of 359, and his viral load was 332. Id. Results from May 2002 showed an increase in viral load to 746, 23% CD4 with an absolute count of 478. Id. Also in May, Plaintiff's CD8 was elevated at 52%,[22] with an elevated absolute count of 1082 (R. at 193). October 2002 results showed an increase in viral load to 970, CD4 at 26%, with an absolute count of 499 (R. at 196). AST and ALT results were generally consistent throughout this period.[23] Id.

On December 27, 2001, Plaintiff's Doctors ordered chest x-rays to assess for pneumonia (R. at 202). Dr. Jack E. Shamoun, M.D., interpreted the images and found "a small subsegmental pneumonia." Id.

On May 20, 2002, Plaintiff was seen by Dr. Miller and PA Dunn (R. at 287-88). Plaintiff weighed 189.5 pounds and reported no physical pain (R. at 287). Plaintiff complained of depression, for which the doctor prescribed Zoloft. Id. PA Dunn and Dr. Miller noted that Plaintiff was using cocaine and drinking beer, which they advised him not to do. Id. Dr. Miller and PA Dunn noted that Plaintiff was not completely compliant with his HIV medication (R. at 288). They attempted to refer Plaintiff for substance abuse treatment, but Plaintiff "refused at this time stating not ready." Id.

Plaintiff was treated by PA Dunn on October 21, 2002 (R. at 194-95). Plaintiff weighed 190 pounds. Id. No complaints were noted, but PA Dunn stated Plaintiff had been regularly taking his meds. Id. She also noted that Plaintiff was occasionally using alcohol and cocaine

---

[21] On laboratory results from Albany Medical Center a normal range for CD4 percentage is 28-51%. See (R. at 193).
[22] Laboratory results from Albany Medical Center give a normal range for CD8 percentage as 12-38%. Id.
[23] From Plaintiff's blood work summary, it appears that Plaintiff visited Albany Medical Center in August 2001 and February 2002, but notes from those visits are not in the record.

and regularly smoking tobacco. Id. PA Dunn continued Plaintiff's Zoloft prescription and also prescribed Trizivir and Motrin. Id.

PA Dunn saw Plaintiff in March 2003 and noted that Plaintiff had been to rehabilitation and was two months clean (R. at 296). Plaintiff complained of pain in his lower back, fatigue caused by his medications, and hearing loss. Id. Laboratory results from March 2003 show low CD4 percentage at 25%, with an absolute count of 428 (R. at 298). Results also showed high CD8 at 50% with a count of 855. Id. Plaintiff's viral load was below detectable limits (R. at 301). A laboratory report dated April 1, 2003 showed 4,600,000 copies/mL of the Hepatitis C virus (R. at 297).

Treatment notes from June 24, 2003 indicate that Plaintiff was receiving outpatient treatment for his substance abuse, was continuing Wellbutrin[24] for his depression, and seeking psychiatric counseling (R. at 304-05). PA Dunn recorded that Plaintiff had some hearing loss (R. at 304). Plaintiff complained of pain in his right ear and pain from the growth on his foot (R. at 305). He weighed 193 pounds. Id. Laboratory results from June indicate an increase in viral load up to 250, some elevated red blood cell indices, low glucose, elevated AST and ALT values, low CD4 at 27% and a count of 454, and high CD8 at 45% with a count of 756 (R. at 306-09). In August 2003, Plaintiff's viral load decreased to 220, but his red blood cell indices, glucose and ALT values remained high (R. at 310-12). His CD4 remained low at 23% and his CD8 high at 49% (R. at 311).

On October 21, 2003, Plaintiff saw PA Dunn and complained of increased pain in his left foot, continuing depression, occasional nausea (R. at 313). Plaintiff weighed 193 pounds. Id. PA Dunn observed Plaintiff's mood and affect as depressed. Id. Laboratory results from October 2003 are unreadable (R. at 316-17).

---

[24] Wellbutrin is a formulation of bupropion, an antidepressant. Id. at 265.

On April 14, 2004, Plaintiff was treated by PA Dunn and complained of dizziness and queasiness, feeling very depressed, unmotivated and anxious (R. at 318). PA Dunn wrote that Plaintiff "admits to feeling a lot of guilt because HIV positive." Id. PA Dunn described Plaintiff's illness as major depressive disorder, continued him on Wellbutrin and started him on Lexapro (R. at 319). Blood test results from April 2004 showed some abnormalities in red blood cell indices, a viral load below detectable levels, and elevated ALT, AST and bilrubin values (R. at 323-25). Plaintiff's CD4 levels were within the reference range, but his CD8 level was still elevated at 53% with a count of 1380 (R. at 326). Testing in November of 2004 showed that Plaintiff's HCV was of the 1b genotype (R. at 425-26).

### 3. St. Mary's Hospital & Rehabilitation Unit

On January 27, 2003, Plaintiff was admitted to St. Mary's Hospital Alcoholism Services (R. at 349-56). PA Elwin McNamara conducted an initial examination upon admission (R. at 351). Plaintiff reported drinking since he was 11 years old and using crack cocaine for the past 20 years as well (R. at 349). PA McNamara noted that Plaintiff's "medical history is significant for HIV [a]s well as for depression." Id. After physical examination, PA McNamara's clinical impression was "alcohol and drug dependence" (R. at 350). Plaintiff was assessed with a Global Assessment of Functioning ("GAF") score of 40-31[25] (R. at 343).

On January 27, 2003, Edward J. Barkley, AC, a counselor at St. Mary's, conducted Plaintiff's inpatient admissions analysis (R. at 354-56). In deciding to admit Plaintiff, Barkley indicated, inter alia, that for Plaintiff "depression and/or other emotional/behavioral symptoms are interfering with abstinence, recovery and stability to a degree that there is a need for an

---

[25] The GAF scale (DSM-IV Axis V) ranks psychological, social, and occupational functioning on a continuum of mental health from 1 to 100. A GAF score between 31 and 40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. GAF Index, http://depts.washington.edu/washinst/Training/CGAS/GAF%20Index.htm (last visited Dec. 10, 2008).

intensively structured and therapeutically-controlled environment to address recovery efforts" (R. at 354-55).

On January 28, 2003, Jana Susi, RN examined Plaintiff (R. at 352-53). Plaintiff reported to her that his last drink was 3-4 six packs beer on January 22 (R. at 352). He reported his pattern in the immediate past as 3-4 six packs of beer daily and cocaine a couple times every couple of weeks. Id. Plaintiff reported consuming alcohol daily since he lost his employment in December of 2002, but that he had a period of abstinence prior to that. Id. Plaintiff complained of "a little anxiety," "a little" nervousness, sadness, fatigue, and shakes. Id. His appetite was "getting better." Id.

Plaintiff was taken out of inpatient care by the local police department on February 20, 2003 (R. at 343-48). Upon discharge from St. Mary's, Mr. Barkley and Dr. Bruce Maslack, M.D.[26] signed off on Plaintiff's discharge summary. Id. Plaintiff was assessed with a GAF score of 60-51[27] (R. at 343). His prognosis was considered fair. Id. Plaintiff was found to have "low self esteem due to unresolved issues of guilt and shame that also affected his spirituality." Id. His treating sources concluded that Plaintiff was "isolated" and lacked a "sober support network" and "sober leisure skills." Id. Mr. Barkley and Dr. Maslack were pleased with Plaintiff's efforts and considered his response to treatment was "adequate and goal oriented." Id. At the next level of care, they indicated the problems to be addressed as "mental and physical stability, recreation and leisure, personality issues, spirituality and social concerns, relapse prevention." Id.

### 4.  Family Counseling Center Mental Health Clinic

In 2003 Plaintiff began treatment at the Family Counseling Center Mental Health Clinic (R. at 278-285). On September 16, 2003, in an initial psychosocial assessment by Robin

---

[26] No specialty is noted in the record for Dr. Maslack.
[27] A GAF score between 60 and 51 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. GAF Index, *supra* note 24.

LaPort,[28] Plaintiff reported "lack of pleasure," depression, being "uncomfortable in [his] own skin," not caring if he lived or died, racing thoughts, daydreaming and fatigue (R. at 278). He reported wanting to work but being physically and psychologically unable to do so since 1991. Id. He reported drug and alcohol use as a method of coping. Id. He said he struggled with isolation and with his girlfriend. Id. Plaintiff reported that his alcohol use started when he was a teenager and he also used cannabis and intravenous cocaine occasionally (R. at 279). He reported insomnia, oversleeping, and irregular sleep. Id. Plaintiff was assessed with agitated and rushed mood and affect, racing thoughts, poor recent memory, "okay remote" memory, lack of insight and poor judgment. Id. The assessment narrative stated that Plaintiff "present[ed] with symptoms of depression, fatigue, hopelessness, poor appetite, and sleep disturbances. Since diagnosis of HIV [positive], [Plaintiff] reports giving up on life and 'just waiting to die.'" Id. The assessment continued, "[s]ignificant history of drug and alcohol use and criminal charges. [Plaintiff] in need[] of [treatment] for his symptoms of severe depression. In addition, psychiatric services recommended due to the severity of his symptoms." Id. Plaintiff was diagnosed with dysthymic disorder and given a GAF score of 48.[29] Id.

An Admission Note dated October 23, 2003 and signed by a psychiatrist and therapist[30] stated that Plaintiff's HIV diagnosis "led to years of depression and loss of motivation and interest" (R. at 284). The onset of his condition is recorded as "over 12 years ago." Id. He was observed as having a flat affect and dysthymic mood. Id. He was given a current GAF of 55[31] and GAF of 48 for the past year. Id.

Plaintiff had ongoing treatment at the Family Counseling Center that is not completely recorded. Several otherwise blank treatment forms in the record indicate that his therapist failed

---

[28] No title is indicated for this clinician.
[29] A GAF score between 41 and 50 indicates that the individual has serious symptoms or a serious impairment in social, occupational, or school functioning. GAF Index, *supra* note 24.
[30] The signatures are illegible, so the names are omitted.
[31] A GAF score between 60 and 51 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. GAF Index, *supra* note 24.

to complete the evaluations and was no longer working at the Center when the forms were requested (R. at 282-83). The records also indicated that Pradeep Marballi, M.D.[32] was prescribing Seroquel,[33] Lexapro[34] and Wellbutrin for Plaintiff in 2004 (R. at 285).

### C. Post-1999 Consulting Examiners

#### 1. Dr. Susan Kerlinsky

On February 13, 2003, at the request of the State agency, Dr. Susan Kerlinsky, M.D.,[35] examined Plaintiff and reviewed some of his records (R. at 212-16). Plaintiff told Dr. Kerlinsky he was diagnosed with HIV in 1991, had pneumonia in 1999 and December 2001, was diagnosed with HCV in 1994 or 1995, and suffered from depression (R. at 212). Plaintiff reported taking AZT, Epivir, and Norvir for four to five years, and taking Trizivir for the past two years. Id. He believed he had never had a liver biopsy and denied having treatment for the HCV. Id. Plaintiff reported fatigue since 1996 or 1997 and generalized body aches and pains since about 1991. Id. Additionally, Plaintiff reported ringing in his left ear since 1998. Id. Plaintiff reported a history of rehabilitation and detoxification as follows: St. Mary's Hospital in January 2003; St. Joseph's Rehabilitation Program in January 2003; detoxification and rehabilitation at Conifer Park in November 2001; CK Post rehabilitation in 1997 and 1998; Plainview Rehabilitation in September 1992. Id. He reported a remote history of intravenous drug use until the early 1980s and his last use of all substances as January 29, 2003 (R. at 213). Plaintiff reported tiring easily, especially when walking short distances or climbing stairs. Id. Upon examination, Plaintiff weighed 192 pounds. Id. Dr. Kerlinsky diagnosed Plaintiff with HIV disease, category B2; HCV; depression, and a hearing impairment (R. at 214). His prognosis was "fair to guarded" and Dr.

---

[32] Dr. Marballi appears to be Plaintiff's psychiatrist.
[33] Seroquel is a formulation of quetiapine, an antipsychotic. *Dorland's*, *supra* note 8, at 1590.
[34] Lexapro is a formulation of escitalopram, a selective serotonin reuptake inhibitor used as an antidepressant. *Id.* at 654.
[35] No specialty is noted for Dr. Kerlinsky.

Kerlinsky concluded that Plaintiff was "restricted from activities requiring mild or greater exertion and he requires frequent rest periods during the day (R. at 215).

### 2.  Annette Payne, Ph.D.

Also on February 13, 2003 and at the request of the State agency, Annette Payne, Ph.D., performed psychiatric and organicity evaluations of Plaintiff (R. at 217-26). Plaintiff told Dr. Payne that he "had difficulty maintaining employment because of his chronic drug and alcohol use as well as his mood swings" (R. at 217). Plaintiff reported that he started using drugs and alcohol at about age 12 or 13, using alcohol, crack, pot, and cocaine "on and off for most of his adult life." Id. However, he told Dr. Payne he was currently clean. Id. Plaintiff also stated he had been to seven prior rehabilitations. Id. Plaintiff reported that the last twelve to thirteen years had been "particularly difficult" because he watched his brother die of AIDS, was diagnosed with HIV, and "stopped counseling and started using again" (R. at 218). He told Dr. Payne he had difficulty coping with his diagnosis and prognosis and "had severe depression on and off." Id. Plaintiff described "dysphoric mood, psychomotor retardation, crying, guilt, hopelessness, loss of usual interests, irritability, fatigue, worthlessness, diminished self esteem, cognitive interference, and a diminished sense of pleasure." Id. Dr. Payne found Plaintiff's mood and affect flat (R. at 219). She noted impairments in Plaintiff's attention and concentration, and recent and remote memory skills. Id. Dr. Payne found Plaintiff's judgment and insight fair. Id. Dr. Payne administered the Wechlser Adult Intelligence Scale III to Plaintiff (R. at 224). Plaintiff obtained a verbal IQ of 77, a performance IQ of 76, and a full scale IQ of 75, which Dr. Payne concluded placed him in the borderline range of intelligence. Id. She also found mild neuropsychological damage (R. at 225). In her medical source statement, Dr. Payne concluded:

> [Plaintiff] would have difficulties following and understanding age appropriate directions. He would have difficulty completing age appropriate tasks. He would have difficulty adequately maintaining appropriate social behavior or responding appropriately to changes in his environment. He would have difficulty learning in accordance to cognitive functioning, asking questions, and requesting assistance in an age appropriate manner. He would have difficulty dealing with the normal

13

stressors of a competitive workplace. His psychiatric difficulties are significantly limiting.  His reports appear consistent with his presentation (R. at 220, 225).

Dr. Payne diagnosed Plaintiff with "depressive disorder, NOS" (not otherwise specified); "anxiety disorder, NOS"; "cognitive disorder, NOS"; "poly substance dependence" with two weeks clean; and "borderline intellectual functioning" (R. at 225). In her recommendations, Dr. Payne noted that the extent and nature of Plaintiff's psychiatric problems were difficult to determine because he had so recently withdrawn from drugs and alcohol (R. at 226). She stated that Plaintiff "has a long history of psychiatric difficulties as well as poly substance dependence" and recommended counseling. Id.

### 3.  Dr. David Pallas

On May 6, 2004, psychiatrist, David Pallas, M.D., evaluated Plaintiff, apparently at Plaintiff's request (R. at 258-60). Dr. Pallas also completed a psychiatric review technique (R. at 261-74) and a mental residual functional capacity ("RFC") assessment (R. at 275-77). During the examination Plaintiff reported to Dr. Pallas that he had been depressed for 10 years, was tired all the time, had poor appetite, poor motivation, no sex drive, insomnia, felt like a "loser," and did not care if he lived or died (R. at 258). Plaintiff reported his stressors as not being able to work, his HIV positive diagnosis, and his HCV. Id. He told Dr. Pallas that his work attempts were unsuccessful because of his low energy, poor concentration, nausea and dizziness. Id. Plaintiff reported his substance abuse history to Dr. Pallas, stating he had been clean since detoxification in February 2003. Id. Plaintiff told Dr. Pallas that he began smoking pot in 1991 and had smoked it every other day. Id. He told Dr. Pallas he had drunk a half-case of beer almost every day since 1992, but that before then he was a social drinker (R. at 258-59). Plaintiff told Dr. Pallas he had snorted cocaine a couple of times a week starting in 1995 (R. at 259). Dr. Pallas' medical source statement concluded:

> This 42 year old man with HIV and hepatitis C presents with a 10 year history of severe depression. His self-esteem is dependent on his working but he's failed to

maintain employment multiple times. He is unable to work due to poor concentration and poor energy level—symptoms of his depression (R. at 260).

Dr. Pallas completed a psychiatric review technique, dated as an assessment as of May 6, 2004 (R. at 261). Dr. Pallas concluded that Plaintiff met Listing 12.04 for Affective Disorders. Id. Dr. Pallas found that Plaintiff had a depressive syndrome characterized by: anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating (R. at 264). Dr. Pallas determined that Plaintiff suffered marked restrictions in his daily activities, marked restrictions in maintaining social functioning, extreme difficulties in maintaining concentration, persistence or pace, and three episodes of decompensation (R. at 271). In support of these findings, Dr. Pallas wrote that Plaintiff had a "ten year history of depression [with] poor sleep, poor energy, poor motivation and interest, poor appetite, poor concentration, [and] feels like a loser because he can't work" (R. at 273). Dr. Pallas further stated, "[d]epression thus far hasn't improved [with] treatment. [History] of alcohol, marijuana and cocaine dependence starting after [diagnosis] of HIV. Sober 15 mo[nth]s. [Positive] family [history] of depression—Mom, sister has cut her wrists a few times." Id.

Finally, Dr. Pallas completed a mental RFC, assessing Plaintiff's current condition (R. at 275). Dr. Pallas found that Plaintiff had marked limitations in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration, and to perform activities on a schedule. Id. He found Plaintiff had a moderate limitation in remembering locations and procedures, and working in coordination with others. Id. He found Plaintiff was not significantly limited in understanding and carrying out simple instructions or making simple work-related decisions. Id. Dr. Pallas found Plaintiff markedly limited in concentration and persistence (R. at 276). He found Plaintiff was not significantly limited in the areas of social interaction or adaptation, with the exception of marked limitation in Plaintiff's ability to travel to unfamiliar place or use public transportation. Id. In support of his conclusions, Dr. Pallas wrote:

15

Mr. Edel has attempted to work but has been unable to do so due to his symptoms of low energy, poor concentration, [and] forgetfulness. (He also suffers from nausea [and] dizziness [possibly secondary] to HIV and/or hepatitis C and/or meds for HIV). His psychiatric symptoms are part of the depressive syndrome he's suffered from for the past 10 years or so. His depression has not responded to treatment with Zoloft, Wellbutrin or Wellbutrin and Lexapro (R. at 277).

### D.  Post-1999 Non-examining Physicians and State Analyst

#### 1.  Dr. Carol A. Wakeley

On February 27, 2003, in response to the State analyst's request for medical advice, Carol A. Wakeley, M.D., reviewed some of Plaintiff's medical records, noted that his October 2002 examination was normal, and recommended finding that the Plaintiff retained the physical RFC to sit for six hours, stand or walk for six hours, and lift a maximum of fifty pounds (R. at 227-28).

#### 2.  State Analyst, Mary Ray

On March 3, 2003, the State agency's analyst, Mary Ray, completed a physical RFC, assessing Plaintiff's current status (R. at 229). Ms. Ray concluded, based on Dr. Wakeley's advice of February 27, 2003, that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand or walk for six out of eight hours, sit for six out of eight hours, and had an unlimited ability to push or pull (R. at 230). She indicated that Plaintiff had no established postural, manipulative, visual, communicative, or environmental limitations (R. at 230-32). In assessing Plaintiff's alleged symptoms, the analyst concluded that his allegation that he could not lift as much as he used to due to fatigue was "credible due to claimant's chronic liver disease" (R. at 232). Ms. Ray rejected the findings of Dr. Kerlinsky, which limited Plaintiff from mild or greater exertion, because the "[o]pinion is non-specific and so therefore is not adopted" (R. at 233).

#### 3.  Terri L. Bruni, Ph.D.

On March 4-5, 2003, at the request of the State agency, Terri L. Bruni, Ph.D., completed a psychiatric review technique and a mental RFC (R. at 235-46). Dr. Bruni did not specify the period of time to which her evaluations applied (R. at 235, 243). In her psychiatric review technique, Dr. Bruni concluded that Plaintiff had several disorders that did not precisely satisfy the listing criteria: a cognitive disorder (R. at 236), a depressive disorder (R. at 237), borderline intellectual functioning (R. at 238), an anxiety disorder (R. at 239), and polysubstance dependence (R. at 240). Dr. Bruni concluded Plaintiff had slight restrictions in activities of daily living, slight difficulties maintaining social functioning, often had deficiencies in maintaining concentration, persistence or pace, and had three episodes of deterioration (R. at 241). In her mental RFC analysis, Dr. Bruni found no marked limitations, but found Plaintiff was moderately limited in the ability to understand and carry out detailed instructions, and maintain attention and concentration for extended periods (R. at 243). Dr. Bruni also found Plaintiff moderately limited in concentration and persistence, interacting appropriately with the general public, maintaining socially appropriate behavior, responding to changes in a work setting, and setting realistic goals (R. at 244). Based on Plaintiff's statements and Dr. Payne's assessment, Dr. Bruni concluded that Plaintiff was "able to understand and remember simple instructions, however he is unable to sustain attention and concentration for simple tasks, respond and relate adequately to others, or adapt to simple changes. However [drug and alcohol abuse] is material to the decision." Id.

### E.  Lay Evidence

Plaintiff submitted affidavits from his mother, Catherine Edel, and a friend, William McGhee, regarding the relevant time period (R. at 175-76, 178). Plaintiff also testified at two hearings before ALJ Gibbons; once in May 2004 and again in March 2005 (R. at 431-56, 457-84).

### 1.  Mother, Catherine Edel

17

Ms. Edel stated that she is close to Plaintiff, and since the 1980s has talked to him several times a week (R. at 175). She stated that before Plaintiff's HIV diagnosis, he was talkative, had good jobs, and fixed things around her house. Id. Ms. Edel attested that Plaintiff lived with her at various times between 1995 and 1999. Id. She stated that during that time Plaintiff became withdrawn, stopped talking as much and exhibited "a depressed mood." Id.  Ms. Edel said Plaintiff would rarely go out, spent days at a time sleeping, and had little or no appetite (R. at 175-76). She "worried about his mental health" (R. at 176). Ms. Edel attested that she frequently found Plaintiff sleeping on the couch during the day when he was not able to work. Id. When he was trying to work, he looked "completely worn out" and would fall asleep on the couch and wake up only to go to bed. Id. She also said that around 1996 she saw Plaintiff become ill and lose weight from his HIV medications. Id. Ms. Edel stated that she believed Plaintiff's described limitations "did not stem from his abuse of drugs or alcohol. Rather, he was overwhelmed by his HIV diagnosis which exhausted him emotionally and physically." Id.

### 2.  Friend, William McGhee

Mr. William McGhee knew Plaintiff and stayed in touch with him between 1995 and 1999 (R. at 178). During this period, Mr. McGhee attested that Plaintiff would often be asleep into the afternoons and unable to socialize. Id. Mr. McGhee said that when Plaintiff was available, he would talk about his brother who had died of AIDS and that Plaintiff's thoughts were "preoccupied with death." Id. Mr. McGhee stated that Plaintiff "appeared completely hopeless" and he often observed Plaintiff "unshaved, unkempt, and with a sad demeanor." Id. In Mr. McGhee's opinion, Plaintiff was "emotionally, . . . in no shape to hold a job." Id.

### 3.  Plaintiff's Testimony

At his first hearing on May 21, 2004, Plaintiff testified that since about 1992, fatigue inhibited his ability to work (R. at 462-64). He said he was "physically wiped out" by working (R. at 462) and each time he tried again to work it would be "too fatiguing" (R. at 463). When

18

questioned by his attorney, Plaintiff explained why he had earned money consistently until about 1992 and then stopped earning money (R. at 474). He said that because of watching his brother suffer with AIDS, and learning that he was also HIV positive, he "just kind of lost it" and "went into a complete spiral" and was "miserable, depressed, and really, really frightened and scared" (R. at 475). He said that eventually he began to feel sick, "because I wasn't taking medication" or going to treatment. Id. He said when he told his wife it "blew us apart," that he lost his family and "didn't know how to deal with it." Id. The ALJ asked why he didn't seek counseling when he was first diagnosed with HIV, Plaintiff replied that he was afraid, that he "didn't want to feel," that he started drinking, clammed up and "went into a very depressed mode" (R. at 476). Plaintiff reported social isolation between 1991 and 1999. Id.

Plaintiff also testified to his symptoms and the effects of his medications. Plaintiff said that in the mid-1990s his HIV medication caused kidney pain, and he would sometimes stop taking Crixivan because of the pain (R. at 477). Plaintiff said that he learned he was HCV positive during this time and he "was still more depressed." Id. He said that he "was totally exhausted from the medications." Id. He also described nausea, dizziness, and muscle and body aches. Id. Plaintiff testified that he has mentally depressed for the last ten years, since his HIV test (R. at 479). He told the ALJ that since then he lost his job with the union and everything "fell apart." Id. Since then, Plaintiff said he does not sleep well, has racing thoughts at night, and night sweats. Id. When asked how he spent his days now, Plaintiff replied that he was "house ridden" [sic] and lacked energy and motivation because of his depression (R. at 470). He testified that his medications made him exhausted and that he often napped in the afternoons. Id.

With respect to his drug and alcohol use, Plaintiff testified that the last time he had a problem with drinking was in 2003 when he went into rehabilitation (R. at 466). He testified that prior to that he had been sober for over a year and then "had like [sic] a couple of weeks slip"

and then went straight into detoxification and then rehabilitation. Id. When the ALJ asked if he had used "any intravenous drugs at any time," Plaintiff replied "No" (R. at 474).

At his second hearing on March 2, 2005 Plaintiff again discussed his drug and alcohol use (R. at 446). Plaintiff admitted to having problems with alcohol and drugs in the 1990s "here and there" but stated he always sought "help if it was getting out of control" and that addiction was "one thing I was always battling." Id. When asked why he drank so much in the 1990s, Plaintiff replied "I had no way to cope with what was going on with my mental and physical health." Id.

Plaintiff testified about his HIV diagnosis and his brother's death in the early 1990s, to which he attributed his depression (R. at 442). Plaintiff said watching his brother die of AIDS scared him. Id. He described walking into his brother's hospital room when he died and seeing his eyes still open and pulling his mother out of the room. Id. He said it scared him because "I knew I was going to end up that way eventually." Id.

Plaintiff explained that he did not seek mental health treatment during the relevant period because, "I was so out of it mentally, I didn't even realize I was that mentally depressed" (R. at 443). Plaintiff also suggested that he might have been afraid to seek help then. Id.

Plaintiff testified that he considered his depression "probably the main cause" of his inability to work in the 1990s (R. at 445). However, he also attributed his inability to work to his symptoms and the side-effects of his medications (R. at 449-50). He said that in the mid-1990s he was diagnosed with HCV, which he noticed made him very tired and further depressed him (R. at 443). He testified that his HIV and HCV affected his ability to sleep and his appetite (R. at 444). He stated that prior to 1999 he took AZT, Epivir, Norvir, and Crixivan for his HIV. Id. Plaintiff described Norvir in particular as "a very strong toxic drug" that caused nausea, affected the inside of his nose, and made him tired. Id. When he was switched from Norvir to Crixivan he

20

said the new drug caused kidney pain (R. at 445). Plaintiff explained that during the 1990s his

symptoms of dizziness, nausea, and exhaustion made it impossible for him to work. Id.

Plaintiff described his daily activities around 1996 (R. at 448). He said that he socialized

more at that time then he does now, but that his life had been "narrowed." Id. He said he lived

with his mother during that time period and did no cooking, no cleaning, no yard work, but might

gather his clothes for the laundry or take out the garbage if it was not too heavy (R. at 449).

### F.  Plaintiff's Work History from 1993

Up through 1992 Plaintiff worked in various jobs, typically accruing four quarters of

coverage. In 1993, Plaintiff did not work.[36] In 1994, Plaintiff had several jobs. He worked for

Schuck and Sons Construction in Arizona in June or July of 1994 as a carpenter helper (R. at

102, 111, 117-18, 127). Plaintiff reported working for Erikson Construction in Arizona for

approximately a month in July or August of 1994 as a construction helper (R. at 106, 117, 119).

He worked for McKeon for about a month in 1994 as a building mechanic (R. at 101, 111).

Between 1995 and 1998 Plaintiff did not work[37] (R. at 97, 102). For a month in 1999 and again

for several months in 2000 Plaintiff worked for Corral Fence Company assisting with fence

installation (R. at 102, 105, 117, 127). In 2001, Plaintiff worked as a carpenter for one or two

months[38] (R. at 103, 105, 127). The SSA noted that all of Plaintiff's work since 1993 lasted less

than three months and was broken up by more than thirty days of not working; therefore, these

jobs were considered unsuccessful work attempts (R. at 116).

### Discussion

### A.  Legal Standard and Scope of Review

---

[36] Social Security Administration ("SSA") records indicated Plaintiff worked in Atlanta, Georgia for a short
time in 1993, but Plaintiff did not recall the company and stated he had never been in Georgia (R. at 97,
101, 112).
[37] Plaintiff did earn $31.25 in 1995, but there is no other indication in the record that he worked in 1995,
nor did the SSA question him about it (R. at 97, 102).
[38] In Plaintiff's earnings records from 2001 and 2002, three earnings were below $750 each and not found
anywhere else in the record (R. at 102-03). They were therefore omitted from the facts.

8.   A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

9.   "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the

[Commissioner], even if it might justifiably have reached a different result upon a de novo

review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

     10.   To be entitled to DIB, a claimant must establish, among other things, that he became

disabled within the meaning of the Act while insured. 42 U.S.C. § 423(a)(1)(A)-(E); see Arnone

v. Bowen, 882 F.2d 34, 38 (2d Cir. 1989). The Commissioner has established a five-step

sequential evaluation process to determine whether an individual is disabled as defined under

the Social Security Act. See 20 C.F.R. § 404.1520. The United States Supreme Court

recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987), and it

remains the proper approach for analyzing whether a claimant is disabled.

     11.   This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently engaged in
> substantial gainful activity. If he is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which significantly limits his
> physical or mental ability to do basic work activities. If the claimant has such an
> impairment, the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix 1 of the regulations. If the
> claimant has such an impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is afflicted with a
> "listed" impairment is unable to perform substantial gainful activity. Assuming the
> claimant does not have a listed impairment, the fourth inquiry is whether, despite
> the claimant's severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform his past work,
> the [Commissioner] then determines whether there is other work which the
> claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan,

168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

     12.   While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146

n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry is, in turn,

divided into two parts. First, the Commissioner must assess the claimant's job qualifications by

considering his physical ability, age, education, and work experience. Second, the

Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

13.  In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above:

1.  The claimant only met the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act until September 30, 1999.
2.  The claimant's work activity was deemed unsuccessful work attempts. Therefore, the claimant had not engaged in substantial gainful activity since the alleged onset of disability.
3.  The claimant's mental impairment was found to be non-severe. However, he did have a severe impairment, based upon the requirements in the Regulations (20 CFR §§ 404.1521 and/or 416.921).
4.  The claimant's medically determinable impairment did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
5.  The undersigned finds the claimant's allegations regarding his limitations are only somewhat credible for the reasons set forth in the body of the decision.
6.  The undersigned has carefully considered the entire record as a whole (20 CFR §§ 404.1527 and/or 416.927).
7.  Between January 1, 1993 and September 30, 1999, the claimant had the functional capacity to perform a full range of sedentary work (20 CFR §§ 404.1567 and/or 416.967).
8.  The claimant did not have the residual functional capacity to perform any of his past relevant [work] (20 CFR §§404.1565 and/or 416.965).
9.  The claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.
10. The claimant was not under a disability as defined in the Social Security Act, at any time between January 1, 1993 and September 30, 1999 (20 CFR §§ 404.1520 and/or 416.920).

(R. at 31-32).

**B.  Plaintiff's Challenge**

14.  Although Plaintiff was represented in the actions below, Plaintiff now appears *pro se* and has failed to file a Brief in this matter. In the absence of a Plaintiff's Brief, the Court assumes that the Plaintiff generally alleges that the ALJ committed legal error and that his

decision was not supported by substantial evidence.[39] <u>Meglino v. Comm'r</u>, No. 5:06-CV-968, 2008 WL 2097221, at *2 (N.D.N.Y. May, 19, 2008) (where *pro se* plaintiff failed to file a brief, the court assumed plaintiff alleged lack of substantial evidence and ALJ error); <u>see generally</u> <u>Cruz v. Sullivan</u> 912 F.2d 8, 11 (2d Cir. 1990) ("[W]hen the claimant appears pro se . . . we have a duty to make a searching investigation of the record to make certain that the claimant's rights have been adequately protected.").

### 1.  Credibility

15.  The ALJ erred in assessing Plaintiff's credibility because he failed to apply the correct legal standard and his decision was not supported by substantial evidence where he relied primarily upon a misstatement of the record.

The ALJ must consider the extent to which subjective evidence of symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(a), (d). The regulations require a two step analysis. <u>Id.</u>; S.S.R. 96-7p, 1996 WL 374186, at *2. First, the ALJ must determine whether medical signs or laboratory findings show any impairment, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404 .1529(a); <u>see also</u> S.S.R. 96-7p, 1996 WL 374186, at *2. Second, if such an impairment is shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. S.S.R. 96-7p, 1996 WL 374186, at *2; <u>see</u> 20 C.F.R. § 404.1529(c). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the following factors: (1) claimant's daily activities; (2) location, duration, frequency,

---

[39] The Court also notes that, when representing Plaintiff before the Appeals Council, his attorney raised the following three issues: (1) that the ALJ erred in assessing the retrospective opinion of Plaintiff's examining psychiatrist: (2) that the ALJ erred in determining Plaintiff's RFC where he failed to assess Plaintiff's borderline intellectual functioning and the non-exertional symptoms of his HIV; and (3) the ALJ erred because substantial evidence shows that Plaintiff's substance abuse prior to September 1999 was not a material factor in his disability.  These three issues will be addressed in the analysis as well.

and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. S.S.R. 96-7p, 1996 WL 374186, at *2; 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii). A credibility assessment "must be based on a consideration of all the evidence in the case record" including the medical evidence, diagnoses, medical opinions, statements from physicians or psychologists, statements from other persons, "prior work record and efforts to work, [and] daily activities." S.S.R. 96-7p, 1996 WL 374186, at *5; see 20 C.F.R. § 404.1529(a); see §§ 404.1512(b)(2)-(6); 404.1513(b)(1), (b)(4), (b)(5), (d).

However, the ALJ is not obliged to blindly accept subjective evidence. Martone v. Apfel, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). An ALJ retains the discretion to evaluate the claimant's subjective testimony, "weighing the objective medical evidence, the claimant's demeanor, other indicia of credibility, as well as any inconsistencies," Id.; see also Crysler v. Astrue, 563 F.Supp.2d 418, 439 (N.D.N.Y. 2008), and arrive at an independent conclusion as to the true extent of the alleged symptoms, such as pain. Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987). If an ALJ rejects Plaintiff's alleged symptoms, he "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." Martone, 70 F.Supp.2d at 151 (quoting Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). Where the ALJ's credibility analysis is based on application of the proper legal standards and supported by substantial evidence, the court must uphold the ALJ's decision and may not substitute its judgment for the Commissioner's. Hogan v. Astrue, 491 F.Supp.2d 347, 352 (W.D.N.Y. 2007) (citing Parker v.

26

Harris, 626 F.2d 225 (2d Cir. 1980)); Aponte v. Sec'y of Dept. of Health & Human Servs., 728

F.2d 588, 591 (2d Cir. 1984) (citations omitted).

Here, the ALJ found the Plaintiff "only somewhat credible" (R. at 28).  The ALJ

summarized Plaintiff's testimony about his symptoms and limitations, which the Court need not

repeat here. Id. In particular, the ALJ noted that "claimant then testified that medication from

Hepatitis C wore him down physically and affected his sleep pattern."  Id. The ALJ provided the

following conclusion and reasoning:

> The Administrative Law Judge finds the claimant's testimony to be only
> somewhat credible. The claimant testified that the medication from the Hepatitis
> C wore him down. He is alleging an onset date of January 1993. Yet, in a report,
> he told Dr. Kerlinsky that he was not diagnosed with Hepatitis C until the mid-
> 1990's, and he denied having any treatment for it.

(R. at 28).

The ALJ's credibility analysis is flawed in two respects. First, the ALJ made neither of the

required findings in the two-step credibility analysis. Second, the ALJ's reason for rejecting

Plaintiff's testimony relies on a misstatement of the record. See Aragon-Lemus v. Barnhart, 280

F.Supp.2d 62, 70 (W.D.N.Y. 2003) (finding the ALJ's credibility analysis not supported by

substantial evidence in part because the ALJ mischaracterized the Plaintiff's testimony).

The ALJ did not complete the two–step credibility analysis.  He failed to state whether

Plaintiff had a medically determinable impairment that could reasonably have produced his

alleged symptoms and limitations and he failed to indicate the intensity, duration or limiting

effects of Plaintiff's symptoms on his ability to work. See Crysler, 563 F.Supp.2d at 442 (finding

the ALJ's credibility analysis flawed in part because "the ALJ failed to state in his decision

whether plaintiff's medical impairments could reasonably be expected to produce the pain or

other symptoms alleged"); see also Foster v. Callahan, No. 96-CV-1858, 1998 WL 106231, at *6

(Mar. 3, 1998 N.D.N.Y.) (remanding, in part, because "the ALJ made no explicit findings

regarding plaintiff's credibility" and based his reasoning on erroneous restatements of the

27

record). Plaintiff alleged symptoms and medication side-effects, including extreme fatigue, nausea, and dizziness. The ALJ did not address whether these could reasonably be expected to flow from Plaintiff's HIV, depression, Hepatitis C, or HIV medications. Nor did the ALJ evaluate "intensity, persistence or limiting effects" of such symptoms. 20 C.F.R. § 404 1529(c). The ALJ correctly pointed out that medical evidence from the relevant period is sparse. However, the regulations clearly state the factors an ALJ should consider when objective evidence alone does not substantiate a Plaintiff's alleged symptoms, which the ALJ apparently did not apply. See 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) (including daily activities and side effects of medication); McCarty v. Astrue, No. 5:05-CV-953, 2008 WL 3884357, at *9 (N.D.N.Y. Aug. 18, 2008) (remanding for failure to apply the factors when the ALJ found the objective evidence alone did not substantiate the intensity, persistence, or limiting effects of the alleged symptoms). It is also unclear that the ALJ assessed Plaintiff's credibility on "all the evidence in the case record" as required. S.S.R. 96-7p, 1996 WL 374186, at *5 (additional factors include statements by other persons, efforts to work, and prior work record). For example, the ALJ did not discuss Plaintiff's strong work history prior to 1993 and his various failed work attempts after that time period. Although the ALJ is "not required to mention or discuss every single piece of evidence in the record," Barringer v. Comm'r of Soc. Sec., 358 F.Supp.2d 67, 78-79 (N.D.N.Y. 2005), he is "required to assess the factors [provided in the regulation] with sufficient specificity to enable this Court to decide whether the determination is supported by substantial evidence." McCarty, 2008 WL 3884357, at *9.

The ALJ's credibility finding is further flawed because his reason for finding Plaintiff not fully credible is based on an incorrect recitation of the record. The only reason the ALJ provided for his credibility finding was the Plaintiff's supposedly inconsistent statements about his Hepatitis C. Although the ALJ repeatedly asserts that Plaintiff claimed to take Hepatitis C medication, a review of the record shows that Plaintiff never made such a claim. Plaintiff testified

that he took several HIV medications and he described side effects from his HIV medications (R. at 444-45). He said he took AZT, Epivir, Norvir, and Crixivan at various times, all for his HIV. Id. He testified that the Norvir in particular made him tired and nauseous (R. at 444). When he switched to Crixivan, Plaintiff said that he suffered from kidney pains (R. at 445). Plaintiff did say that his Hepatitis C contributed to his fatigue, but at no point in the record did he claim to have taken medication for it. See (R. at 443). Accordingly, the ALJ's conclusion as to Plaintiff's inconsistent statement is not supported by substantial evidence. Since the ALJ did not provide other substantial evidence for rejecting Plaintiff's alleged symptoms and side-effects, this Court cannot say that his credibility finding is otherwise supported by substantial evidence. See Barringer, 358 F.Supp.2d at 82 n.26 (N.D.N.Y. 2005) (noting that incorrect statements of fact are harmless error when an ALJ provides other evidence that amply supports the credibility analysis).

The Court notes that in another section of his decision, the ALJ discussed inconsistencies in Plaintiff's reports of his history of drug and alcohol use. See (R. at 25-26). Such inconsistencies would be proper for an ALJ to consider in deciding to discredit a claimant. S.S.R. 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."); see 20 C.F.R. § 404.1529(c)(4); see e.g., Roy v. Massanari, No. 3:01-CV-306, 2002 WL 32502101, at *2-3 (D. Conn. June 12, 2002) (upholding the ALJ's conclusion that the claimant was not entirely credible "in part, on discrepant reports as to alcohol consumption"). However in this case, the ALJ reasoned that these inconsistencies discredited the medical opinions (R. at 25) (giving not much, if any, weight to medical opinions because they were "based on the claimant's own subjective recollection of his substance abuse and medical history. . . . allegations [that] are not completely supported." ). It does not appear that the ALJ was attempting to reason that this inconsistency was the basis for his credibility finding as to

Plaintiff's symptoms. However, even if the ALJ meant to include this in his credibility reasoning, the ALJ's failure to apply the two step credibility analysis is basis enough for remand on this issue.

Because the ALJ did not properly complete the credibility analysis and his determination relied on an erroneous recitation of the facts, the Court recommends that the case be remanded to the ALJ for further analysis, including an accurate characterization of the record and application of the required credibility analysis and necessary factors.

### 2.  Step Two Severity Analysis

16.  At step two, the ALJ must determine whether an individual has an impairment or combination of impairments that are severe. 20 C.F.R. § 404.1520. The Second Circuit has warned that the step two analysis may not do more than "screen out *de minimis* claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995). An impairment is not severe if it does not significantly limit a claimant's ability to do basic work activities. 20 C.F.R. § 404.1521(a). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, "walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; . . . seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [using] judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); see also S.S.R. 85-28, 1985 WL 56856, at *3-4.

If a claimant has multiple impairments, the combined effect of all impairments should be considered "without regard as to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523; 42 U.S.C. § 423(d)(2)(B). "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work." Rosario v. Apfel,

No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting S.S.R. 85-28, 1985 WL 56856, at *3).

In this case, the Plaintiff has alleged disability due to HIV, Hepatitis C, and depression. The ALJ found that Plaintiff's depression was not severe prior to September 30, 1999 (R. at 26) and found Plaintiff's HIV to be severe as of January 1, 1993 (R. at 27). Although the ALJ did not make a specific severity finding as to Plaintiff's Hepatitis C, he did find that there was not enough evidence to establish Plaintiff's HCV as a limiting factor in his RFC analysis (R. at 30). Therefore, the Court declines to recommend remand on this basis. See e.g., McConnell v. Astrue, No. 6:03-CV-0521, 2008 WL 833968, at *11-12 (N.D.N.Y. Mar. 27, 2008) (declining to remand where ALJ did not mention Plaintiff's carpel tunnel in the severity analysis but found no associated significant limitations in his functional assessment).

### 3. Step Three Listing Analysis

17. At step three, the ALJ must determine whether the Plaintiff has an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir.1995). Specifically, "[a]ny individual with HIV infection, including one with a diagnosis of acquired immunodeficiency syndrome (AIDS), may be found disabled under this listing if his or her impairment meets any of the criteria in 14.08 or is of equivalent severity to any impairment in 14.08." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00(D)(1). The most relevant Listing, 14.08(N), "requires proof of HIV infection and repeated manifestations of HIV infection resulting in significant, documented symptoms such as fatigue, fever, weight loss, night sweats and one of the following at a marked level: restrictions of daily activities, difficulties in maintaining social functioning, or difficulties in completing tasks in a timely manner due to

31

deficiencies in concentration, persistence or pace." Gonzalez v. Barnhart, 491 F.Supp.2d 329,

335 n.10, (W.D.N.Y. 2007) (quoting 20 C.F.R., Part 404, Subpt. P., App. 1, § 14.08N). A

diagnosis of HIV alone is not enough to meet a 14.08 Listing; the HIV must be accompanied by

the listed impairments at the severity described. See e.g., Roman v. Barnhart, 477 F.Supp.2d

587, 598 (S.D.N.Y. 2007) (finding the Plaintiff not disabled due to HIV infection where

accompanying impairments were "isolated incidents" rather than "chronic" ailments).

Here, the ALJ found that "the record does not disclose medical findings that meet or

equal in severity the clinical criteria of any impairment listed in . . . [the] Regulations" (R. at 27).

The ALJ's opinion in this regard appears to be supported by substantial evidence in the record.

However, the Court suggests that the ALJ revisit this evaluation once he has properly

considered Plaintiff's credibility.

### 4.  Step Four RFC Analysis

18.  Remand is also recommended because the ALJ's RFC determination does not meet

the legal standard. The ALJ found that Plaintiff could perform the full range of sedentary work.

However, the ALJ failed to set forth the basis for his determination. Moreover, it is unclear if the

ALJ had any evidence to upon which to rely once he found Plaintiff not entirely credible and, as

a consequence, rejected every medical opinion. In this respect, the ALJ may need to further

develop the record.

RFC is the most a claimant can still do despite his limitations. 20 C.F.R. §

404.1545(a)(1); see Martone v. Apfel, 70 F.Supp.2d 145, 150 (N.D.N.Y. 1999). To determine

RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts,

physical and mental abilities, non-severe impairments, and Plaintiff's subjective evidence of

symptoms. 20 C.F.R. §§ 404.1545(b)-(e); see Ferraris v. Heckler, 728 F.2d 582, 585 (2d Cir.

1984). The ALJ must specify the functions a claimant is capable of performing, but conclusory

statements by him will not suffice. Martone, 70 F.Supp.2d at 150. For an RFC finding to be

upheld there must be substantial evidence in the record to support each requirement listed in the regulations. Id. (citing LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). "It is well-settled that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Hogan v. Astrue, 491 F.Supp.2d 347, 354 (W.D.N.Y. 2007) (quoting S.S.R. 96-8p, 1996 WL 374184, at *7). "[T]he failure to specify the basis for a conclusion as to residual functional capacity is reason enough to vacate a decision." White v. Sec'y of Health & Human Servs., 910 F.2d 64, 65 (2d Cir. 1990).

In this case, the ALJ concluded:

> The Administrative Law Judge finds that it would be reasonable to ascertain that the claimant had at least retained the residual functional capacity to perform a full range of sedentary work activity between 1993 and 1999. It is reasonable to ascertain that the claimant was capable of lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. The claimant had the ability to walk and stand for a total of two hours in an eight-hour day.

(R. at 30). Although the ALJ concluded that Plaintiff could perform the full range of sedentary work, he failed to describe any specific evidence to support this determination. This failure alone is a basis for remand. See White, 910 F.2d at 65.

Further, the ALJ rejected each of the medical opinions that provided functional assessments. The ALJ did "not give much weight, if any, to the reports or opinions of any examining or non-examining physician dated after the claimant's insured status expired in 1999" (R. at 25). He thereby rejected the reports from Dr. Payne, Dr. Kerlinsky, Dr. Wakeley, Dr. Bruni, and Dr. Pallas, which constituted all the medical opinions in the record. "This left the ALJ with no other assessments on which to provide him guidance in formulating Plaintiff's RFC." Derouin v. Comm'r of Soc. Sec., No. 7:05-CV-211, 2008 WL 4279503, at *7 (N.D.N.Y. Aug 18, 2008) (remanding for development of the record where the only medical opinion with a functional

33

assessment was properly rejected, leaving the ALJ with no assessment to guide him in determining the RFC).

Additionally, this Court cannot find any medical opinion in the record that fully supports the ALJ's RFC. See Duross v. Comm'r of Soc. Sec., No. 1:05-CV-368, 2008 WL 4239791, at *10 (N.D.N.Y. Sept. 11, 2008) (remanding ALJ's RFC, noting that "no opinion contained in the record suggests the exact limitations proposed by the ALJ"); see generally S.S.R. 96-8p, 1996 WL 374184, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Even if the ALJ had accepted the medical opinions, none of the assessments match the ALJ's RFC. For example, examining physician, Dr. Kerlinsky found Plaintiff was restricted from activities requiring mild or greater exertion and that he required frequent rest periods (R. at 215). Examining physician, Dr. Payne, found that Plaintiff would have difficulty following directions and completing tasks in an age appropriate manner and opined that Plaintiff's psychiatric problems were "significantly limiting" (R. at 220, 225). Even the less favorable findings of non-examining physician, Dr. Wakeley, differ from the ALJ's RFC. Dr. Wakeley found that Plaintiff could sit for six hours, stand or walk for six hours and lift up to fifty pounds (R. at 227).

Because the ALJ failed to specify any evidence supporting his RFC, and because he had no medical assessments to guide his determination and "no opinion contained in the record suggests the exact limitations proposed by the ALJ, we are led to believe that the ALJ simply substituted his own judgment" for competent medical opinions. Duross, 2008 WL 4239791, at *10; see also Dailey v. Barnhart, 277 F.Supp.2d 226, 236 (W.D.N.Y. 2003) (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)) ("In the absence of a medical opinion to support the ALJ's finding as to [Plaintiff's] ability to perform sedentary work, it is well settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."). Instead, the ALJ had an affirmative duty to develop the medical record if it was incomplete. Tejada v. Apfel, 167

F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d); <u>see</u> <u>White</u>, 910 F.2d at 65 (suggesting

amplification of the record where ALJ did not specify the basis for the RFC and the medical

opinion of the Plaintiff's limitations was inconclusive); <u>see e.g.</u>, <u>Hogan</u>, 491 F.Supp.2d at 354

(remanding to develop the record where the basis for ALJ's RFC was unclear and he failed to

cite any medical evidence to support his findings); <u>Derouin</u>, 2008 WL 4279503, at *7 (remanding

for development of the record where ALJ had no medical assessments to guide his RFC).

Therefore this Court recommends remand so the ALJ may develop the record as needed to

properly support an RFC determination.

      With respect to the RFC evaluation, the Court also notes the argument raised previously

by Plaintiff's attorney that the ALJ erred in failing to assess Plaintiff's borderline intellectual

functioning and the non-exertional symptoms of his HIV. When formulating Plaintiff's RFC, the

ALJ has a duty to "consider all of [the claimant's] medically determinable impairments of which

[he is] aware." 20 C.F.R. § 404.1545(a)(2); <u>see also</u> 20 C.F.R. § 404.1545(e). It does not appear

that the ALJ addressed either of these limitations in his RFC analysis. Upon remand, the ALJ's

RFC analysis "must address both the remaining exertional and nonexertional capacities of an

individual." S.S.R. 96-8p, 1996 WL 374184, at *5.

### 5.  Medical Opinions

      19.  The Court notes that Plaintiff's attorney had argued before the Appeal's Council that

Dr. Pallas's retrospective opinion, that Plaintiff had a ten year history of severe depression, was

supported by medically accepted diagnostic techniques and instead of being dismissed, it

should have been considered by the ALJ.

      Neither a treating nor examining physician's opinion should be dismissed merely

because it is retrospective. <u>See</u> <u>Dousewicz v. Harris</u>, 646 F.2d 771, 774 (2d Cir. 1981). In the

Second Circuit, a treating physician's retrospective opinion is entitled to controlling weight

unless it is contradicted by other medical evidence or "overwhelmingly compelling" non-medical

evidence. Rivera v. Sullivan, 923 F.2d 964, 968-69 (2d Cir. 1991); Wagner v. Sec'y of Health & Human Servs, 906 F.2d 856, 862 (2d Cir. 1991). Similarly, in the Second Circuit an examining physician's retrospective opinion may be substantial evidence to support a finding of disability when not controverted by other evidence. See McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983) (finding the ALJ's denial of disability not supported by substantial evidence when he failed to credit the consultative examining physician's retrospective opinion that Plaintiff was disabled since birth and the medical evidence subsequent to the date last insured supported the diagnosis); see also Roman v. Sec'y of Dept. of Health & Human Servs., No. 90-CV-2701, 1991 WL 105649, *2 (E.D.N.Y. June 3, 1991) (finding error where the ALJ rejected the retrospective opinion of an examining physician whose opinion was predicated on reliable medical practice, was consistent with other examining physician's opinion and consistent with the lay testimony).

In this case, Dr. Pallas's opinion is the only medical opinion that could be interpreted as a retrospective opinion because he states that Plaintiff has been depressed for the past ten years (R. at 277). The other medical opinions do not expressly apply to Plaintiff's condition prior to their evaluations (R. at 217-26, 212-16, 227-28, 229-33, 235-46). However, the ALJ did not appear to discount Dr. Pallas' opinion because it was retrospective. Instead, the ALJ discounted Dr. Pallas' opinion for reasons that will be discussed below. Thus, Plaintiff's argument that the ALJ has improperly ignored a retrospective opinion does not apply here.

Here, the ALJ discounted all the medical opinions for the same reasons, stating they were more significant to Plaintiff's current condition than to his condition between 1993 and 1999 (R. at 25). The ALJ gave two reasons for assigning "not . . . much, if any" weight to the medical opinions. Id. First, the ALJ was concerned that the evidence was not contemporaneous because the "opinions formed are from recent evaluations of the claimant" (R. at 25). Second,

the ALJ felt that the opinions were "based on the claimant's own subjective recollections of his substance abuse and medical history." Id.

The ALJ was free to provide appropriate reasons for discounting Dr. Pallas' opinion, as well as the other medical opinions. The regulations specify the factors an ALJ must consider when determining the weight to give to any medical opinion. Unless controlling weight is given to a treating source's opinion, the ALJ will consider: (1) examination; (2) treatment relationship; (3) supportability of the opinion; (4) consistency with the record as a whole; and (5) the source's specialization. 20 C.F.R. §§ 404.1527(d)(1)-(5). However, an ALJ will also consider other factors "which tend to support or contradict the opinion." Id. § 404.1527(d)(6). For example, the regulations suggest that "the extent to which an acceptable medical source is familiar with the other information in [the] case record" may be a relevant factor. Id. Because the Court has recommended remand on other grounds, and the ALJ will be assessing the Plaintiff's testimony and may be seeking additional evidence, the ALJ should also clarify his reasoning for the weight assigned to the medical opinions in light of the case law reviewed below.

As to the ALJ's first reason, that the medical opinions were only relevant to Plaintiff's current conditions, the Second Circuit has said that while lack of contemporaneous medical evidence undermines a claim, a Plaintiff may nonetheless demonstrate disability "by means of evidence only from before or after that period." Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989). Subsequent evidence "is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations" before the date last insured. Lisa v. Sec'y of Health & Human Servs., 940 F.2d 40, 44 (2d Cir. 1991) (citations omitted); see e.g., Reyes v. Barnhart, 226 F.Supp.2d 523, 530 (S.D.N.Y. 2002) (finding  that "the severity of the conditions in the period shortly after the relevant time period len[t] strong support to [the] conclusion that the very same conditions were disabling in the

relevant time period."); see also Ventura v. Barnhart, No. 3:04-CV-1401, 2006 WL 1272668, at

*20 (D. Conn. Feb. 2, 2006) ("The Second Circuit has held that medical records that post-date

the date last insured may be relevant to bolster the credibility of the plaintiff's subjective

complaints."). On the other hand, subsequent evidence has been disregarded when in the

interim there was a remission or the claimant was otherwise unable to demonstrate disability.

Selig v. Richardson, 379 F. Supp. 594, 600 (E.D.N.Y. 1974). Thus, while the Second Circuit has

not said that the ALJ must consider subsequent evidence, it has said that such evidence may be

probative and courts have remanded for failure to consider it at the very least for corroboration.

See e.g., Bettis v. Chater, Unempl. Ins. Rep., No. 94-CV-1521, 1996 WL 19214 (E.D.N.Y. 1996)

(remanding in part because the ALJ failed to consider whether the medical evidence

subsequent to her cut-off date might objectively verify the severity and continuity of her

condition prior her date last insured); Selig, 379 F. Supp. at 602 (remanding in part because "the

court cannot escape the impression that the decision below fails to adequately assess the

probative weight (or lack thereof) of the [subsequent] medical evidence favorable to plaintiff").

     In this case, as the ALJ recognized, each of the medical opinions were formed based on

subsequent evaluations. However, the fact that the evaluations were subsequent to the relevant

time period may have been more probative for discrediting some opinions than for others. This

is particularly true where, as here, some of the medical opinions had additional medical signs or

laboratory findings upon which they based their conclusions. For example, Dr. Kerlinsky's

opinion was based upon her review of Plaintiff's medical records, her examination of the

Plaintiff, and a blood test report that she ordered (R. at 212-16). On the other hand, Dr. Pallas'

opinion was based only on his examination of Plaintiff and, as the ALJ points out, Plaintiff gave

him false information about the length of Plaintiff's drug and alcohol abuse (R. at 258-60). Dr.

Payne's opinion was based upon her examination of the Plaintiff and administering and scoring

Plaintiff's results on the Wechsler Adult Intelligence Scale III (R. at 224). Dr. Payne's opinion

was unique because it was based upon IQ tests, which are presumed to remain constant throughout a claimant's lifetime. See Santiago v. Astrue, No. 07-CV-6239, 2008 WL 2405728, at *3-4 (W.D.N.Y. June 11, 2008) (endorsing the view that "absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout [the plaintiff's] life) (quoting Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir. 2001); citing Figueroa Rivera v. Apfel, No. 98-CV-619E, 2000 WL 1568596, [at *3 ] (W.D.N.Y. Sept. 29, 2000)). "[A]n ALJ is not required to accept a claimant's IQ scores when they are inconsistent with the record. . . . [but] [a]bsent any evidence of a change in the plaintiff's intellectual functioning, it is appropriate to assume that plaintiff's IQ has not changed . . . ." Vasquez-Ortiz v. Apfel, 48 F.Supp.2d 250, 257 (W.D.N.Y.1999). The ALJ's decision does not discuss the value of Plaintiff's IQ scores, or acknowledge the presumption that they apply to the relevant time period. Upon remand, the Court recommends that the ALJ clarify his reasoning with regard to the probative value of each subsequent medical opinion, particularly Dr. Payne's opinions, and the IQ scores upon which they were based.

Courts have also addressed the ALJ's second reason—that the opinions were based on Plaintiff's subjective statements about his addictions and his medical history.  Courts have held that a Plaintiff's inconsistent statements about drug and alcohol use to an examining physician are a basis for discrediting that physician's medical report. See Roy, 2002 WL 32502101, at *3 (finding no error in ALJ assessing the credibility of examining physician's medical report and partially rejecting it where it was premised on inaccurate facts about the Plaintiff's drug use). However, the Court notes that Dr. Pallas was the only physician to whom Plaintiff gave false information. The ALJ found that Plaintiff "admitted" his true drug and alcohol history to Dr. Payne (R. at 25). A review of Dr. Kerlinsky's report reveals that Plaintiff also gave her the same accurate addiction history (R. at 212). Thus, the ALJ's reasoning was valid with respect to Dr. Pallas' opinion, which was in fact based on Plaintiff's false statements. But, the ALJ's reasoning

does not apply to the other medical opinions. Nonetheless, the ALJ used this reasoning to discount all the opinions.

The ALJ also discounted the medical opinions because the physicians relied on Plaintiff's subjective version of his medical history. The Second Circuit has said that the fact that a Doctor also relies on a Plaintiff's subjective complaints does not undermine his opinion "as a patient's report of complaints, or history, is an essential diagnostic tool." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003); see e.g., McCarty v. Astrue, 2008 WL 3884357, at *6 (Aug. 18, 2008 N.D.N.Y.) (finding that "reliance on Plaintiff's subjective complaints is not a valid basis for rejecting [the treating physician's] opinion."); see also Hussain v. Astrue, No. 07-CV-210C, 2008 WL 4724301, at *5 (Oct. 24, 2008 W.D.N.Y.) (similar analysis with regard to consulting physician's opinion). Thus, Plaintiff's subjective recitation of his medical history was not improper for the physicians to rely upon.

Because the ALJ's reasoning applies more appropriately to some of the medical opinions than others, the Court recommends that the ALJ amplify his reasoning for rejecting each of the medical opinions. Although he correctly noted that they were all based, at least in part, on subsequent examinations of Plaintiff, that alone may not be a basis to reject some of the opinions. For example, Plaintiff's false statements are a valid reason for discounting Dr. Pallas' opinion, but such reasoning does not apply to the weight assigned to Dr. Kerlinsky's or Dr. Payne's opinions.

### 6.  Step Five Application of the Grid

20.  "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (citing 20 C.F.R. Part 404, Subpart P, Appendix 2). The grids assess the claimant's residual functional capacity, age, education and work experience, to determine whether the claimant can engage in any substantial gainful work existing in the national

economy. Id. The grids are dispositive when a claimant suffers only exertional impairments.[40]

Bapp, 802 F.2d at 604. However "in a case where both exertional and nonexertional limitations[41]

are present, the guidelines cannot provide the exclusive framework for making a disability

determination." Id. Where nonexertional impairments significantly diminish a Plaintiff's ability to

work, so that he is unable to perform the full range of a work category, then the ALJ must

introduce evidence that jobs exist in the national economy which Plaintiff can perform. Id.

Here, the ALJ found that Plaintiff was a younger individual, with a high school education,

and capable of making an adjustment to work that existed in significant numbers in the national

economy (R. at 31). He found that Plaintiff's combination of exertional and non-exertional

limitations did not significantly narrow Plaintiff's range of work. Id. Without identifying a specific

grid rule, the ALJ concluded that Plaintiff was not under a disability. Id. As the Court has already

recommended remand based on the ALJ's credibility and RFC analyses, the ALJ's application of

the grid at step five is necessarily flawed, preventing the Court from appropriately analyzing the

RFC determination. Nonetheless, the Court suggests that the ALJ identify the rule he applies

should he again reach this stage of the analysis.

### 7.  Drug and Alcohol Addiction

21.  Plaintiff's attorney also argued before the Appeals Council that the ALJ erred

because Plaintiff's substance abuse was not a material factor to his claim of having been

disabled since January 1, 1993. Plaintiff's argument is moot because the ALJ did not actually

conclude that Plaintiff's drug and alcohol abuse was material to his disability. Instead, the ALJ

said that *if* Plaintiff's depression had been found to be disabling, then the drug an alcohol abuse

*would have been* material (R. at 27). In his words, the ALJ found "that the claimant's drug and

---

[40] Exertional impairments affect the claimant's ability to meet strength demands of a job such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 404.1569a(b).
[41] Nonexertional limitations include "limitations or restrictions in functioning due to nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, and performing manipulative or postural functions such as reaching, handling, stooping, climbing, crawling, or crouching." Crysler, 563 F.Supp.2d at 438, n.18; see also 20 C.F.R. §§ 416.969a(c)(1)(i)-(iv).

alcohol addiction most definitely would have been a contributing factor material to the determination of disability, if in fact, the claimant's mental impairment were found to have been severe and disabling." Id. Although the ALJ did not have to determine whether addiction was material in this case, since he did not find Plaintiff disabled 20 C.F.R. § 404.1535 ("*If we find that you are disabled* . . . we must determine whether your drug addiction or alcoholism is . . . material.") (emphasis added), his theoretical discussion here was not error. However, upon reconsideration, the ALJ will necessarily be required to engage in such an analysis should he find Plaintiff disabled.

### 8.   Onset Date of Disability

22.   The onset date of disability is the first day an individual is disabled as defined in the Act. S.S.R. 83-20, 1983 WL 31249, at *1. When disability is of nontraumatic origin, the ALJ will consider the applicant's allegations, work history, and the medical and other evidence concerning impairment severity. Id. at *2. Medical evidence is considered the primary element in the onset determination. Id. When adequate medical records are not available for a progressive impairment, "it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." Id. The Plaintiff's alleged date of onset should only be used if it is "consistent with all of the evidence available." Id. at *3. Any inferred onset date should have a medical basis and an ALJ "should call on the services of a medical advisor when onset must be inferred." Id. But when a reasonable inference cannot be made on the basis of the record and relevant medical evidence, the ALJ should explore other sources, such as lay witnesses. Id.; see e.g., Manago v. Barnhart, 321 F.Supp.2d 559 (E.D.N.Y. 2004) (finding an earlier onset of disability could be inferred from claimant's testimony as to his subjective complaints, his work history, corroboration provided by his former wife, and those physicians' reports which considered an onset date, despite absence of contemporaneous

medical records). However, lay evidence may only be credited to the degree it is not contrary to the medical evidence. Id.

In this case, the ALJ noted that determining a date of onset was particularly difficult because Plaintiff's condition was progressive and adequate medical records were not available from the relevant time period (R at 28). The ALJ considered the lay evidence from Mrs. Edel, Plaintiff's mother, and Mr. McGhee, Plaintiff's friend (R. at 28-29). Although the ALJ did not assign a weight to these affidavits, he apparently discounted them because he concluded that some of the symptoms they described Plaintiff exhibiting during the mid-1990s could be attributed to drug and alcohol abuse (R. at 29). Ultimately, the ALJ found that there was not enough evidence to reasonably conclude that Plaintiff's condition existed at a disabling level of severity so as to prevent him from engaging in significant gainful activity for at least 12 months, or result in death, at any time between January 1, 1993 and September 30, 1999 (R. at 29).

Because the Court has already found the ALJ's credibility and RFC analyses flawed, the ALJ's onset analysis must necessarily be revisited. The Court notes, that should the ALJ again reach this stage of the analysis, S.S.R. 83-20 recommends that an ALJ "should call on the services of a medical advisor when onset must be inferred." S.S.R. 83-20, 1983 WL 31249, at *3; see Telfair v. Astrue, No. 04-CV- 2122, 2007 WL 1522616, *6 (S.D.N.Y. 2007) ("Although there is no controlling Second Circuit precedent on this issue, case law applying Ruling 83-20 in other circuits indicates that an ALJ should consult a medical advisor at the hearing when the medical evidence in the record is ambiguous.").

**Conclusion**

23.  Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED and REMANDED for reconsideration.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


DATED: February 10, 2009

Syracuse, New York


**Orders**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED**.

Dated:   February 10, 2009

Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge